DECISION
This matter is before the Court for decision after a jury-waived trial. The centerpiece of this controversy is an agreement entered into by defendant Valerie Hill and plaintiff Dallas Pell Yates for the sale of 570 Bellevue Avenue, Newport to plaintiff for one million dollars. Mrs. Yates has remained ready, willing and able to close but Mrs. Hill has declined to convey.
Mrs. Hill testified that she has owned and resided at the real estate in question for the past 23 years. The carriage house, situated on two oceanfront acres and formerly part of the Astor estate, includes the main residence, a guest apartment, and a greenhouse apartment. Since 1995 Mrs. Hill has let out the apartments in her individual capacity as owner/lessor. Mrs. Hill continued to manage, maintain and contract the property in her personal and individual capacity even though it had been placed in the D. Valerie Hill Trust in 1994. It should be noted that the Trust was originally executed in 1992 in tandem with a durable power of attorney in which Mrs. Hill appointed her daughter, Melanie A. Preston, and her son, Melvin F. Hill III, to act as her representatives with full power of substitution. Mrs. Hill testified that during her lifetime she is the sole trustee of the D. Valerie Hill Trust.
Coincidentally, her daughter and son were licensed real estate professionals who had been listing the property from time to time for approximately ten years. Mr. Hill was and remains the principal in M.F. Hill Realty, Inc. and his sister, although not an active agent, has displayed her license in his office for the past eight years. Every listing agreement bears the signature "D. Valerie Hill." The first such agreement (Exhibit 30A) extended from September 1, 1988 to December 31, 1988, but did not set a price. The following year, from October 5, 1989 to July 5, 1990, the sale price was set at $1,500,000. (Exhibit 30B). In 1991, from January 10 to July 10, the price was reduced to $1,350,000. (Exhibit 30C). That price was also set for January 15, 1992 to August 15, 1992. (Exhibit 30D). With the exception of a ten day suspension the terms continued through March 25, 1993. (Exhibit 30E). The agreement was renewed for the periods May 10, 1993 to November 10, 1993 and January 23, 1994 to July 23, 1994. (Exhibits 30F and G). The successor listing agreement, from September 30, 1994 to May 1, 1995 reduced the price to $1,100,000. (Exhibit 30H). The listing was renewed at that reduced price from April 19, 1996 to October 19, 1996 and from March 10, 1997 to September 10, 1997. (Exhibits 30I and J). Just days before the latter expired, a couple who had been tenants on the property offered Mrs. Hill $900,000 to purchase it. (Exhibit 29). Mrs. Hill rejected this offer.
In 1998 the property was advertised statewide in the Multiple Listing Service (MLS). Every two weeks MLS publishes an information book, available only to participant realtors, containing all active listings of properties for sale throughout the state. Exhibits 32, 36 and 33 reveal that the Bellevue Avenue property was displayed for sale at $1,100,000 in the MLS books published on February 23, 1998, March 23, 1998 and April 20, 1998.
In March, via the MLS book, the listing came to the attention of Edith Cushing, an agent of Lila Delman Real Estate, who had been showing properties to plaintiff. Ms. Cushing knew Mrs. Hill and described her as "very cordial, gracious, accommodating and knowledgeable." On March 28, plaintiff, accompanied by her mother, Nuala Pell, and others viewed the property. Mrs. Pell testified that Mrs. Hill "couldn't have been nicer," and was pleased that plaintiff wanted to buy the property. Mrs. Pell further described Mrs. Hill as "completely alert and sharp as a tack." Edith Cushing and Melanie Preston negotiated on behalf of their clients and a price of $1,000,000 was settled upon. The agreement, signed by plaintiff and "Valerie Hill" on April 9, 1998 provided for a closing on September 11, 1998. (Exhibit 3).
After the agreement was signed, Mrs. Yates engaged an appraiser, an attorney and various inspectors. As to the latter, she hired: Alpha Environmental to do a lead inspection; Quinn Building Consultants to conduct electromagnetic field tests; Waterworks Laboratories to analyze the household water; Niton Corporation to do radon testing; and, QBC to do a structural inspection. (See Exhibits 7, 8, 11, 13, 15). At Mrs. Hill's request, she was furnished with a copy of the building inspection report. Interestingly. Mrs. Hill hand-wrote comments in the margins responding to the observations of the inspectors. Her remarks evidence her intelligence, precision, and excellent memory. Her comments include the following: "Gutters were put in last year . . . also cement poured at foundation on Beechwood side three year ago."; "The windows in the potting shed section were all removed, painted and caulked where necessary — two summers ago."; "Arthur Rondale repaired the roof last year."; "This drain is only three years old and to my knowledge is not congested."; "All plugs and switches were replaced with newer ones during the winter of 1996."; "The water tank is three months old., "; "This is a new dishwasher `96 and I can't find any rust."
When the original closing date arrived, Mrs. Hill signed an addendum (Exhibit 10A) extending the contingency date for the mortgage commitment to August 15, 1998. Plaintiff agreed to furnish Mrs. Hill with a pre-approval letter by May 1, 1998. The addendum further provided that Mrs. Hill would extend the closing date to seven days after the closing on plaintiff's New York home; or, October 30, 1998, "whichever is sooner." On May 11, 1998, a pre-qualification letter issued from Chase Manhattan Mortgage Corporation stating that plaintiff was "exceptionally well-qualified to purchase the home . . ." (Exhibit 16). The final mortgage loan commitment issued on August 11, 1998. (Plaintiff's 20A).
On September 18, 1998 Mrs. Hill and daughter Abby called plaintiff and told her that Mrs. Hill was "having second thoughts." A couple of days later, Melanie called plaintiff, sobbing, and explained that Abby was "making trouble" and "interfering." Buddy Hill explained to Edith Cushing that he did not understand his mother's turnaround and also attributed it to his sisters' (not Melanie) "causing problems." Presently Mr. Hill is estranged from his mother, a situation he hopes is temporary. There is no evidence whatsoever that Mr. Hill attempted in any way to influence his mothers decision. On the contrary, he was exceedingly accommodating in putting the property on and off the market for ten years. He sensibly advised his mother that $1,000,000 was a fair sale price.
On September 24, 1998 Ms. Gushing wrote to Mrs. Hill reconfirming that plaintiff had closed on her New York residence, but out of courtesy to Mrs. Hill would extend the closing date to October 1, 1998. (Exhibit 24). Two days later, attorney Richard Fisher wrote a letter to plaintiff stating that Mrs. Hill "no longer wishes to sell her property and is asking that you relieve her from her obligations under this agreement." (Exhibit 25). Mr. Fisher alleged that at the time Mrs. Hill executed the agreement she was "poorly advised." She had undergone surgery, had failed to take her medication, "and had just turned the age of 75 . . . In summary, Mrs. Hill has changed her mind." (Exhibit 25).
In her testimony, Mrs. Hill said that she "freely and voluntarily" signed the Purchase and Sales Agreement, that she understood that she was selling the property and that she has sold property before, it was not until late August or early September after a family meeting that she realized how much the house meant to her children, and that it would be a "mistake" to sell it. Prior to the time this family meeting was convened, Mrs. Hill had already packed and had never expressed any intention of not going through with the sale. Evidently some of her children were trying to persuade her not to sell the property — certainly neither Melanie nor Buddy, who had been attempting to sell the property for the past ten years. The prospect of the sale of this house was no sudden event. Mrs. Hill had signed a series of agreements with her son and daughter, over an entire decade offering the Property for sale. She took great pains to analyze the inspection report and elucidate upon the maintenance history of the house.
Most compelling, here, is Mrs. Hill's demeanor and deportment. She is a lady of impeccable appearance and manners, who displays high intelligence, great lucidity and precision of thought. The Court is convinced that she was fully aware of the obligations she was assuming when she signed the Purchase and Sale Agreement. Her about-face is apparently a response to some disappointed children. It matters not that the property was held in the "D. Valerie Hill Trust." For all intents and purposes, Mrs. Hill is that Trust. Furthermore, her successor Trustees (whose powers need not even be invoked, as Mrs. Hill is perfectly capable of handling her own affairs) are the very son and daughter who were assisting their mother in offering the property for sale. Yet, Mrs. Hill never revealed the existence of the Trust to her realtor children until this controversy arose. In fact, Buddy Hill knew nothing of his appointment until he testified in Court on June 22, 1999. Mrs. Hill consistently and continually held herself out as the owner of this property. She clothed herself with the clear authority to convey this property. It would be unfair and inequitable to allow the seller to employ the device of the Trust to escape the obligations of the agreement. Mrs. Hill's Commitment to the agreement was the product of an alert and intelligent mind. "Having second thoughts" . . . "disappointing her children" . . . thinking she "made a mistake" months after the agreement, cannot furnish any legal basis for avoidance. The record is devoid of any evidence which could be interpreted as furnishing any sound reason for extinguishing defendant's obligations. The unimpeached evidence makes it abundantly clear that the plaintiff has, at all times, been ready, willing and able to close. She is legally entitled to the performance of this contract. Mrs. Hill must honor the promises which she freely, voluntarily, and intelligently extended.
Therefore, the Court enters judgment for the plaintiff and orders the defendant(s) to specifically perform the Purchase and Sale Agreement.